UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LBS PETROLEUM, LLC, a Florida limited
liability company, on Its Own Behalf and on
Behalf Of All Others Similarly Situated

                Plaintiff,

                CASE NO.: 1:15-CV-22880-UU

    -against-

TULGA DEMIR *et. al.*

                Defendants.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT[1]**

Plaintiff, LBS Petroleum, LLC ("Plaintiff"), through undersigned counsel, pursuant to the Federal Rules of Civil Procedure and the Local Rules of this Court, hereby files its Response in Opposition to Tulga Demir ("Demir"), Rachael L. Robinson ("Robinson"), Global Energy Acquisitions, LLC ("GEA"), Demir Energy, LLC ("Demir Energy"), KY Oil Management, LLC ("KY Oil") and GEA Oil Drilling, LLC ("GEA Oil") (collectively, "Defendants")  Motion to Dismiss [ECF No. 14] (the "Motion to Dismiss").

---

[1] Defendants' Motion to Dismiss was directed to the First Amended Complaint, but in light of the minor revision between the First Amended Complaint and the Second Amended Complaint the Court ruled that the Motion to Dismiss the First Amended Complaint would be treated as responsive to the Second Amended Complaint [ECF No. 15].

For the reasons set forth herein and in the incorporated memorandum of law, the Motion to Dismiss must be denied.

## INTRODUCTION AND BACKGROUND FACTS

1. As it is set forth in the Second Amended Complaint [ECF No. 16], Demir, Robinson and Demir's alter egos GEA, GEA Oil and Demir Energy and others fraudulently offered unregistered securities for sale in a classic Ponzi scheme. [ECF No. 16 ¶ 1]. Demir, Robinson, GEA, GEA Oil and Demir Energy did this in violation of the registration and anti-fraud provisions of the federal securities laws. [ECF No. 16 ¶ 2]. The scheme is based upon investors' purported investments into GEA and Demir Energy so that these entities can finance oil-drilling operations in Kentucky. *Id.* Upon information and belief, Demir raised in excess of $5 million dollars from unsuspecting investors. *Id.* In exchange for their investments, Demir promised high returns based on the false output of the various oil wells purportedly drilled by GEA, Demir Energy and GEA Oil. *Id.*

2. Demir's investment program in actuality operates as an embezzlement scheme with the characteristics of a Ponzi scheme, i.e., a schemer whereby returns are paid to investors from monies contributed by later investors. [ECF No. 16 ¶ 3]. Demir's investment program runs like an embezzlement scheme whereby he converts for himself the vast majority of the investors' funds and proceeds for any sales of crude oil. *Id.*

3. Demir and his girlfriend, Rachael Robinson, have been using investors' funds for their own personal use to acquire luxury vehicles, rent high-end penthouses in the Southern District of Florida, taking extravagant vacations, paying personal credit cards, paying thousands of dollars to strippers at Dean's Gold in Miami, etc. To the extent that the oil wells produce any oil, Demir and Robinson convert the proceeds of such sales to local oil distributors, instead of paying investors their promised return. Demir's unlawful and criminal conduct has been widely reported by his former business partner and founder of GEA, Bryan Mendes,[2] which has provided extensive factual and documentary based on his personal knowledge to support about Demir's ongoing scam in the website www.tulgademirfraud.com. [ECF No. 16 ¶ 7].

4. In order to lure investors, Demir recycled time and time again a private placement memorandum (the "PPM") that purported to offer unregistered securities consistent with Regulation D of the Securities Act [ECF No. 8-2, Exhibit B to the Second Amended Complaint]. However, all issuers of securities relying on the Regulation D exemption are required to file a document called a **Form D no later than 15 days after**

---

[2] Defendants refer to Bryan Mendes' blog as if he were an outsider journalist. However, Bryan Mendes and Demir were roomates and they both founded and operated GEA together until Demir defrauded him as well. Moreover, Mendes has personal knolwedge about Defendants' fraudulent scheme having had access for a period of time to the corporate book and records of the entities used by Demir to perpetrate the fraud. In short, Mendes is playing the same role that James Davis played in bringing down Robert Allen Stanford, the second largest Ponzi schemer after Bernie Madoff.

**they first sell the securities in the offering**.  *See* http://www.sec.gov/oiea/investor-alerts-bulletins/ib_privateplacements.html.  The Form D must include brief information about the issuer, its management and promoters, and the offering itself.  *Id.*, *see also* 17 CFR § 230.503(a) ("An issuer offering or selling securities in reliance of § 230.504, § 230.505, or § 230.506 **must file** with the [SEC] a notice of sales containing the information required by Form D . . . for each new offering of securities no later than 15 days after the first sale of securities in the offering).

     5.     A search of the U.S. Securities & Exchange Commission ("SEC") EDGAR database reveals that neither GEA, Demir Energy, KY Oil, GEA Oil nor any of the funds GEAP1 through GEAP4 ever filed the required Form D with the SEC in order to be exempt from registration pursuant to Regulation D of the Securities Act.  In addition, even if Defendants had made the filing of Form D with the SEC (which they did not), and as Defendants themselves acknowledge, Rule 506(c) under Regulation D of the Securities Act requires the issuer of the security to take reasonable steps to verify the accredited investor status of the prospective buyers of the securities.  *See* 17 C.F.R. § 230.506(c).

     6.     Defendants attempt to turn securities law on its head by arguing that merely because the fraudulent PPM states that the securities are subject to Regulation D that is all that is needed to be covered by the exemption even though it is judicially noticeable that Form D was never filed with the SEC.  Moreover, Defendants seek to be

4

covered by Regulation D even though Defendants never even attempted to make a reasonable effort to check if the victims of their embezzlement scheme were in fact accredited investors.

7. Defendants try to further support their fantastical claim that the securities were exempt from registration by pointing the Court to the self-serving language in the Securities Purchase Agreement, a contract of adhesion drafted by GEA's counsel, including a representation from the investors such as Plaintiff that they were in fact accredited investors.  If an issuer's inclusion of self-serving language in a subscription agreement were all that was needed to make a security offering exempt from registration under Regulation D, all securities offerings in the United States would probably be exempt under Regulation D.  Neither the law nor common sense provide for such an absurd result.

8. Defendants also have the audacity of claiming that the Second Amended Complaint does not plead fraud with particularity.  Yet, Defendants completely ignore Plaintiff's most serious allegations about Defendants' fraudulent misrepresentations in the PPM itself most notably that: (a) neither GEA (nor GEAP3 or any of the other funds for that matter) owned the oil leaseholds which in fact were owned at the relevant time by KY Oil [ECF No. 16 ¶ 44]; (b) the entire biography of Demir was false [ECF No. 16 ¶ 43]; (c) that the funds raised would be used to pay for the Turnkey Drilling Costs and Turnkey Completion Costs instead of for Demir's and Robinson's personal use [ECF

No. 16 ¶ 49]; and (d) that investors would get a revenue share from the sale of crude oil instead of Defendants converting the overwhelming majority of the proceeds from sales of crude oil for themselves [ECF No. 16 ¶ 48]. In addition, in order to induce Plaintiff to invest in the unregistered securities, Demir showed Plaintiff a false bank account statement for GEA showing a balance in excess of $20 million dollars.[3] [ECF No. 16 ¶ 47].

9. In short, if Plaintiff has not plead Defendant's fraudulent scheme with particularity, then Plaintiff wonders what more is required given the documentation that has been appended to its pleading and given the fact that Plaintiff's detailed allegations which must be taken as true and construed in the light most favorably to Plaintiff at this stage of the case. In short, as set out below in the incorporated memorandum of law, Defendants' Motion to Dismiss should be denied because Plaintiff has plead with enough particularity and detail the fraudulent embezzlement scheme perpetrated on Plaintiff and the Class by Defendants.

---

[3] Plaintiff inadvertently stated that Demir showed the fraudulent bank accounts statement in October 2013, the date Plaintiff was reinstated with the Florida Division of Corporations. However, this was a typographical error and in fact Demir showed the false bank account statement to Plaintiff's principal in early August 2012 at the same time Plaintiff was established as a Florida limited liability company. Moreover, Plaintiff alleges, and Defendants do not dispute, that the same false bank account statement was shown by Demir to class member, Bright Ahead Energy, LLC in order to fraudulent induce it to invest in the unregistered securities.

## MEMORANDUM OF LAW

### I.  MOTION TO DISMISS STANDARD

A complaint should not be dismissed for failure to state a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). "In evaluating the sufficiency of a complaint, a court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *Beck v. Deloitte & Touche*, 144 F.3d 732, 735 (11th Cir. 1998). "In seeking a dismissal for failure to state a viable claim, a defendant thus bears the '**very high burden**' of showing that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief." *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1321 (M.D. Fla. 2007) (emphasis added). As set forth herein, Defendants do not come close to satisfying their very high burden.

### II.  THE MOTION TO DISMISS MUST BE DENIED BECAUSE PLAINTIFF'S WELL PLEADED ALLEGATIONS MUST BE ACCEPTED AS TRUE AND BECAUSE PLAINTIFF HAS SUFFICIENTLY STATED CLAIMS FOR RELIEF

Under Fed. R. Civ. P. 12(b)(6), a court shall grant a motion to dismiss where, based upon a **dispositive issue of law**, the factual allegations of the complaint cannot support the cause of action. *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir.

7

2006) (emphasis added).  Indeed, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a complaint must contain "sufficient factual matter, **accepted as true**, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570) (emphasis added).

Nonetheless, a complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor. *Twombly*, 550 U.S. at 555. A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

In this case, Plaintiff sufficiently asserted claims for violations of the federal securities laws and regulations as well as for aiding and abetting fraud and conversion. Specifically, Plaintiff alleged that few if any of the purchasers of the securities offered by Demir and his alter ego entities were accredited investors and that no exemption from registration applies. [ECF No. 16 ¶ 5].

Moreover, as set forth herein, Demir and his alter ego entities did not comply with Regulation D by failing to file Form D with the SEC, a fact that is judicially noticeable by the Court. *See United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003)(citations omitted) ("Public records and government documents are generally considered not to be subject to reasonable dispute . . . This

8

includes public records and government documents available from reliable sources on the Internet."); *see also In re Agribiotech Sec. Litig.*, No. CV-S-990144 PMP (LRL), 2000 WL 35595963, at *2 (D. Nev. Mar. 2, 2000) ("In this new technological age, official government or company documents may be judicially notices insofar as they are available via the worldwide web").

As set out above, while Defendants acknowledge that they had a duty to check the accredited investor status of the purchasers of securities, Defendants do not identify what steps, if any, they took to comply with the applicable regulation other than to point to the self-serving language of the fraudulent documents they prepared with the assistance of counsel.  Defendants want this Court to make the absurd conclusion that just because they say the securities were exempt they must be so even if the documents they prepared contained representations that an issuer of securities is bound to double check by among other things reviewing a series of non-exclusive documents identified in 17 CFR § 203.506(c).

If Defendants fatally flawed argument were to be accepted by this Court, every fraudster offering unregistered securities could claim an exemption from registration under Regulation D by including a representation in the subscription agreement (all of which are contracts of adhesion) that the purchaser is an accredited investor.  However, this is not the law.  Defendants cannot disregard the requirements of 17 CFR §

203.506(c) through the self-serving, conclusory and unchecked representations of accredited investor status inserted into the subscription agreement.

Furthermore, Defendants' reliance on *Faye L. Roth Revocable Trust v. UBS Painewebber, Inc.*, 323 F. Supp. 2d 1279 (S.D. Fla. 2004) is misplaced for a number of reasons.  First, in *Faye* the Court ruled on **a motion or summary judgment** after the parties had the opportunity to conduct extensive discovery as to whether the investors in question were accredited.  Second, in *Faye* there was no material dispute that the offering was only made to accredited investors.  *Faye* at 1301.  Moreover the record in *Faye* revealed that UBS, the issuer, had followed a number of procedures to ensure that the investors were indeed accredited including for example that UBS' financial advisors had to complete offerees questionnaires attesting to the fact that the financial advisor was aware of and **could document the financial circumstances or sophistication of the prospective investor**. *Id.*

Here, Plaintiff has alleged that few if any of the investors targeted by Demir and his alter ego entities were accredited investors.  This allegation must be taken as true at this stage and construed in the light most favorably to Plaintiff.  However, Plaintiff reasonably believes that discovery will show that Demir and his alter ego entities did not take **any** steps to confirm that the victims of his embezzlement scheme were accredited investors and that no documentation relevant to this query of any kind was collected and reviewed by Defendants prior to the sale of the unregistered securities.

"[T]o recover on a Section 10(b) claim, a Plaintiff 'must allege material misstatements or omissions indicating an intent to deceive or defraud **in connection with** the purchase or sale of a security.'"  *See Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899, 903 (S.D.N.Y. 1990) (citations omitted) (*cited by* Defendants).  "The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for consideration known to the buyer not to be what it purports to be."  *Id.* (citations omitted).  "The 'in connection with' requirement mandates that the alleged fraud concern the fundamental **nature** of [the] [securities]: namely the characteristics and attributes that would induce an investor to buy or sell the particular [securities]."  *Id.* (citations omitted).  "Thus, '[t]o fall within Section 10(b), misrepresentations must have some direct pertinence to a securities transaction.'"  *Id.* (citations omitted).

As set out above at paragraph 8, Plaintiff has pleaded with enough detail the fraudulent statements made by Demir and his alter ego entities in connection with the fraudulent securities offering.  All of the fraudulent statements pleaded by Plaintiff are material and neither Plaintiff nor any of the other investors for that matter would have purchased the securities but for their reliance on the fraudulent investments.  Plaintiff would not have purchased the securities if it had known that (i) GEA and/or GEAP3 did

11

not own the oil leaseholds that were at the heart of the securities offering; (ii) Demir did not have any of the impressive credentials he proclaimed to have in the PPM and in his oral presentations to Plaintiff and other investors; (iii) the vast majority of the funds were going to be used to fund his luxurious lifestyle instead of for funding the oil drilling operations; (iv) Demir would convert for himself the overwhelming majority of the revenues generated by the sale of crude oil; and (v) GEA did not have assets in excess of $20 million dollars as falsely represented in a fraudulent bank account statement of GEA shown to Plaintiff. If this is not pleading fraud with enough specificity, then nothing is.

Moreover, all of these misrepresentations of fact concern the **fundamental nature of the securities** because they include: (a) the background of the CEO, Demir; (b) the financial condition of the entity in which securities were purchased; (c) the purported purpose for which the investors' funds were going to be used for; (d) the expectation of investors' return based on the promised revenue splits from sales of crude oil which were the only source under which investors would make any money in consideration for their investment; and (e) the ownership of the oil leasehold rights.

All of these representations with the exception of the false bank account statement were made in the PPM and its supporting exhibits. Thus, any claim that an action sounding in fraud under Section 10(b) of the Securities Act and Rule 10b-5 cannot be maintained because the same misrepresentations of fact were also made in the

Securities Purchase Agreement are nothing more than a fallacy. To illustrate the absurdity of Defendants' argument it only needs to be pointed out that every securities fraud case involves some sort of contract for the purchase and/or sale of the securities,. However, if material misrepresentations and/or omissions of material of fact were made in connection with the acquisition of the securities an action sounding in fraud under Section 10(b) of the Securities Act and Rule 10b-5 will lie.

In *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988 (11th Cir. 2014), the Eleventh Circuit acknowledged that a cause of action for aiding and abetting conversion exists and reasoned that under Florida law the elements of such claim are: (1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor. *Perlman* at 993 (citations omitted). Similarly, this Court has also held that a claim for aiding and abetting a Rule 10b-5 violation will lie if "some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abetter knowingly and substantially assisted the violation." *See AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991).

"The tort of conversion applies to many types of personal property, **including money**." *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595 (M.D. Fla. 1991) (emphasis added).

"In an action for conversion of money, the money must be specific money that is capable of identification." *Id.* Conversion claims generally are recognized in connection with funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction. *See, e.g., ADP Investor Commun. Servs, Inc. v. In House Attorney Servs.*, 390 F. Supp. 2d 212 (E.D.N.Y. 2005).

Thus, Defendants' claim that no cause of action for aiding and abetting conversion exist is without any merit. Moreover, there is no contract between Plaintiff (nor any of the members of the Class) and Demir in his personal capacity and it was Demir (with Robinson's knowledge and substantial assistance) who converted the investors' funds for his own personal use to fund his luxurious life. In fact, Plaintiff attached to the Second Amended Complaint documents showing how Demir converted investors' funds by running charges from Robinson's PayPal account into his corporate AMEX credit card in order move funds between the operating bank account of GEA and GEA Oil into the PayPal account of Robinson [ECF No. 8-7].

Furthermore, Plaintiff has identified the specific money that was converted by Demir and his alter ego entities and it includes two (2) main categories: (a) the principal amount of the investment made by Plaintiff (and the Class) which as to Plaintiff alone involves the sum of $440,000.00 [ECF No. 16 ¶ 20] and (b) the proceeds of the sales of crude oil to local oil distributors [ECF No. 16 ¶ 29]. As to the principal amount of the

investment, those funds are identifiable, should have been segregated for a specific purpose (to fund oil drilling operations) and were wrongfully converted in an identifiable transaction (the sale of unregistered securities). On the other hand, the funds converted from the sales of crude oil are also identifiable (a subpoena to the buyers of the crude oil will identify all of the payments made) and were converted in an identifiable transaction (the sale of unregistered securities under which these payments were going to serve as the revenue stream for the purchasers of the securities). In short, Plaintiff has sufficiently pleaded a claim for aiding and abetting conversion against Robinson.

### III.  THE SECOND AMENDED COMPLAINT IS NOT A "SHOTGUN" PLEADING

Defendants argue, without providing any specific example, that "54 paragraphs of allegations . . . could not possibly be relevant to each cause and party." Nothing can be further from the truth. The allegations in paragraphs 1 through 54 set forth in detail the Defendants' embezzlement scheme, how it was conceived, what false representations were made, the mental state of the Defendants at the time the allegations were made, what Defendants did with the embezzled funds and how Defendants engaged in money laundering techniques to move the proceeds of the fraud. Moreover, each count specifically identifies the particular defendant(s) against whom Plaintiff seeks relief. Moreover, there are no inconsistent allegations of fact that have been incorporated by reference into each count. To the contrary, all of the

15

allegations tell the story of the unscrupulous fraudulent scheme perpetrated by Demir and his alter ego entities with the knowledge and substantial assistant of co-defendant, Robinson.

  **IV.** **PLAINTIFF HAS STANDING TO ASSERT CLAIMS ON BEHALF OF THE CLASS**

  At the Rule 12(b)(6) stage, plaintiffs have been allowed to pursue claims on behalf of holders of securities that plaintiffs themselves did not purchase where defendants allegedly made the exact same misrepresentations with respect to both series of securities. *See In re Dynex Capital, Inc. Securities Litigation*, No. 05 Civ. 1897(HB), 2009 WL 3380621, at *18 (S.D.N.Y. Oct. 19, 2009) (holding that Plaintiffs had adequately alleged their standing to proceed on behalf of purchasers of two different series of bonds because they allege that Defendants made the exact same misrepresentations as to both series and that the bond collateral suffered from the same defects).

  In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), the Second Circuit held that a purchaser of securities had class standing to bring claims on behalf of the buyers of other securities were a single SEC Shelf Registration Statement common to all of the purchasers was rife with misstatements providing the glue that binds together the absent class members' purchasers of securities. In *NECA*, the court pronounced a two-part test for class standing in a

putative class action where the plaintiff purchased a different security than the absentee class members.

Specifically, "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the **same set of concerns** as the conduct alleged to have caused injury to other members of the putative class by **the same defendants**." *NECA* at 161 (emphasis added). "When this standard is satisfied, the name plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the name plaintiff may properly assert claims on their behalf." *Ret. Bd. Of the Policemen's Annuity & Ben. Fund., et. al. v. Bank of New York Mellon*, 775 F.3d 154, 161 (2d Cir. 2014) (*cited* by Defendants).

Here, there can be no dispute that Plaintiff has satisfied the first part of the NECA's test, that is, Plaintiff has adequately pleaded that it has suffered an actual injury (the loss of $440,000.00) as a result of Defendants' illegal conduct. In addition, Plaintiff also meets the second part of the NECA's test because the conduct at issue implicates the same set of concerns that have caused injury to the members of the class (their loss of their principal investment) by the same Defendants.

Specifically, Plaintiff alleged that Demir has recycled the same legal documentation including the PPM (containing the same misrepresentations and omissions of material fact) for each of the purported funds (GEAP1 through 4, and the

17

yet to be known funds for GEA's successor, Demir Energy) [ECF No. 16 ¶ 30]. Moreover, Plaintiff has alleged that GEA and Demir Energy (and all of the other related entities including GEAP1 through 4) are alter egos of Demir all of which are operating a single enterprise to carry on with the same fraudulent scheme. *Id.* Plaintiff has further alleged that GEA and Demir Energy have comingled investment funds for the various funds into the same bank accounts maintained by GEA, GEA Oil, and Demir Energy. *Id.* Moreover, Plaintiff has alleged that Demir has assigned the revenue splits of some funds to others and that Demir has been comingling amongst his various alter ego entities assets, revenue splits, oil wells showing that Demir operates a single fraudulent enterprise [ECF No. 16 ¶ 31].

In short, the absent class members' claims are similar to those of Plaintiff in all essential respects: the offering documents contained identical statements including misrepresentations of material fact and the same Defendants issued all of the securities in question since GEAP1-4 are the alter egos of Demir given the comingling of all the material respects of the operation. The same evidence introduced to establish Plaintiff's claims will be the same evidence that is needed to establish the claims of the absentee class members (i.e., lack of Form D filing, misrepresentations of material fact in offering documents, conversion of investor's funds, conversion of revenues from sales of crude oil, etc.)

## **CONCLUSION**

Accepting the "well pleaded facts as true" and resolving them "in the light most favorable to the plaintiff", Defendants have not sustained their "very high burden" of showing "that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief." *Beck*, 144 F.3d at 735; *Third Party Verification*, 492 F. Supp. 2d at 1321. Plaintiff has specifically alleged violations of the federal securities laws and supporting regulations as well as claims for aiding and abetting fraud and conversation. Moreover, Plaintiff has sufficiently pleaded his standing to prosecute this action as a class action. For these and the other reasons outlined herein, Defendants' Motion to Dismiss the Second Amended Complaint should be denied.

**WHEREFORE**, Plaintiff, LBS Petroleum, LLC, respectfully request that the Court deny Defendants' Motion to Dismiss the Second Amended Complaint and order the Defendants to answer the Second Amended Complaint within a time certain.[4]

Dated:  August 19, 2015.

        Respectfully submitted,

        LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
        1001 Brickell Bay Drive, 9th Floor
        Miami, Florida 33131
        E-mail: rodrigo@rdasilvalaw.com
        Telephone:    (305) 615-1434
        Facsimile:    (305) 615-1435

---

[4] In the event of a full or partial dismissal of the claims against one or more of the Defendants here, Plaintiff respectfully requests leave to amend the Second Amended Complaint.

19

By: /s/ *Rodrigo S. Da Silva*
Rodrigo S. Da Silva, Esq.
Florida Bar No. 0088600
*Counsel for Plaintiff, LBS Petroleum, LLC*

**CERTIFICATION OF SERVICE**

I hereby certify that on August 19, 2015, I filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Rodrigo S. Da Silva*
Rodrigo S. Da Silva, Esq.